UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHELLE PAYMENT,                              Case No. 2:19-cv-00192

          Plaintiff,                           Hon. Paul L. Maloney
                                               U.S. District Judge
v.

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

On February 26, 2016, Plaintiff Michelle Payment applied for disability and disability insurance benefits (DIB).  (ECF No. 4-5, PageID.140.)  She suffers from severe impairments that include degenerative disc disease and degenerative joint disease.  (ECF No. 4-2, PageID.30.)  The Social Security Administration denied Payment's application, and she requested a hearing before an Administrative Law Judge (ALJ).  (ECF No. 4-4, PageID.84, 92.)   ALJ Timothy J. Malloy conducted this hearing on May 31, 2018.  (ECF No. 4-2, PageID.41.)  Then, on September 5, 2018, Judge Malloy issued a decision ruling that Payment was not under a disability from the alleged onset date, June 1, 2015, through the date last insured, December 31, 2015.  (*Id.*, PageID.28-34.)

Payment now appeals Judge Malloy's decision.  (ECF No. 1, PageID.1.)  She argues that the ALJ erred when assessing the consistency of her description of her symptoms, which led the ALJ to the wrong conclusion regarding her residual

functional capacity (RFC).  She identifies one error in this analysis:  the ALJ's failure to consider adequately the side effects of her medications during the relevant period.  Second, Payment says the ALJ erred at step five of his disability analysis by failing to ask the vocational expert (VE) whether significant numbers of jobs existed in the national economy that Payment could perform.

A review of the record indicates that the ALJ conducted a procedurally correct analysis.  As to the first issue, the record shows that Payment brought up the medication side effects issue briefly during her hearing before the ALJ on May 31, 2018.  She testified that she could not remember which specific pain killers she was taking during the relevant period in 2015, but stated that her medications "sort of make me groggy."  (ECF No. 4-2, PageID.65.)  The record reflects that the ALJ stated a number of reasons for finding that Payment's subjective description of her symptoms was inconsistent with the record.  In the opinion of the undersigned, Payment's brief, non-specific reference to side effects caused by her medications was not enough to trigger a more in-depth analysis by the ALJ, and his failure to do so does not constitute error.  Second, at step five of his disability analysis, the ALJ relied on Rule 202.21 in Table 2 of the Medical-Vocational Guidelines (commonly known as "the grid"), which considers a claimant's age, education, past work experience and RFC.  Given Payment's age, education and work history, and the ALJ's conclusion that Payment could do the full range of light work, Rule 202.21 in Table 2 dictated that she was not disabled.  Case law from the Sixth Circuit allows the ALJ to reach this conclusion in the manner he employed.

The undersigned respectfully recommends that the Court affirm the ALJ's decision.

## II.    Summary of Plaintiff's Background and Medical Care

A review of the medical records in this case indicates that Payment has suffered a number of serious back and knee injuries and conditions and has undergone a number of procedures to treat these injuries and conditions.  Key procedures in her medical history that are relatively close in time to the relevant period include:

- a cervical discectomy in June 2014,

- steroid injections in her SI joint in December 2014,

- arthroscopic surgery in July 2015 to fix a torn meniscus in her right knee,

- steroid injections in her right knee from August to October 2015,

- steroid injections in her back in December 2015, and

- a total right knee replacement in May 2016.

A more detailed description of her medical history follows.

On June 10, 2014, Dr. Kevin Lawson, M.D., performed a cervical discectomy replacing the disc at C6-7 in Payment's spine.  (ECF No. 4-7, PageID.241.)  Then, on December 15, 2014, Dr. Lawson injected a steroid into Payment's sacroiliac (SI) joint after she complained of low back pain.  (*Id.*, PageID.243.)    Payment was taking Percocet and Vitamin D3.  (*Id.*, PageID.247.)

On June 19, 2015, Payment began treatment with Dr. Shane Woolever, D.O., for right knee pain.  (*Id.*, PageID.288-289.)  Dr. Woolever noted that Payment walked with a limp.  (*Id.*)  X-rays revealed degenerative changes of the right knee through the medial compartment, joint space narrowing, early osteophytosis and deformity.  (*Id.*)  Dr. Woolever, noted left knee joint disease that was failing conservative treatment and that Payment had had arthroscopy and a corticosteroid injection.  (*Id.*, PageID.284.)  Payment began viscosupplementation treatment for her left knee.  (*Id.*)

A July 2015 MRI revealed a medial meniscus tear in Payment's right knee.  (*Id.*, PageID.287.)  On July 10, 2015, Payment had arthroscopic surgery to repair this meniscus tear.  (*Id.*, PageID.303-304.)  Less than two weeks after surgery, on July 20, 2015, Payment reported "snapping" in her knee, pain and swelling.  She also said that she was not taking her Norco pain medication.  (*Id.*, PageID.296.)  Payment received five steroid injections in her right knee between August and October of 2015.  (*Id.*, PageID.280-283, 285.)  In November 2015, Dr. Woolever prescribed an unloader brace for right knee chodromalacia.  Dr. Woolever wrote the following regarding Payment's condition:

**CHIEF COMPLAINT**
Seen today for her right knee. She is status post Euflexxa injections. She is not any better. She still has pain medially. She says she still continues to get effusion. She is on her Percocet; however, she is not taking anti-inflammatories. I suggested to her she take some anti-inflammatory. I will give her a prescription for Cataflam today.

**PHYSICAL EXAMINATION**
She has 2+ effusion in her knee. She has extension to zero, flexion to 115 degrees. She is neurovascularly intact distally. No Homans sign or calf tenderness. She does have slight varus deformity to her right knee. Minimal laxity in the medial collateral ligament. She has pain mostly over the medial joint line in an area where she has C3 chondromalacia at the patellofemoral joint. She says occasionally she does get some clicking through this area as well. She had a previous arthroscopy with chondroplasty through this area as well as previous partial medial meniscectomy.

(*Id.*, PageID.280.)

Payment received an MRI of her lumbar spine on September 29, 2015, with similar results to her November 18, 2014 MRI – showing mild lumbar spondylosis. (ECF No. 4-8, PageID.424.) The impression showed no significant disc diseases, but some slight degenerative change with narrowing and loss of T2 weighted signal seen at the L2-L3 level, facet joint arthropathy throughout the lumbar spine, prominent from L3-L4 through L5-S1, but foraminal narrowing or stenosis only at L5-S1. (*Id.*, PageID.425-426.) There was no canal stenosis, but facet joint arthropathy was found to be a significant pain generator. (*Id.*)

Dr. Gary Fuchs, M.D., examined Payment on December 18, 2015, noting worsening back pain over the past 15 years after she was in a car accident as a youth. (ECF No. 4-7, PageID.349.) Dr. Fuchs treated Payment with steroid injections. (*Id.*, PageID.346-347, 351.)

Dr. Blake Slater, D.O., examined Payment on January 25, 2016 and noted:

**Progress**
**MDM:**
PT GIVEN MULTIPLE DOSES OF PAIN MEDICATIONS HOWEVER WHAT HELPED HER PAIN IS
DILAUDID. THERE ARE NO CT FINDINGS TO ACCOUNT FOR HIP AND PELVIS PAIN. THERE ARE
NO SCIATIC SYMPTOMS. PT ENCOURAGED TO REST, ICE HIP. RX FOR DILAUDID 2 MG Q 4
HOURS. TO F/U WITH PCP IN 1-2 DAYS. ALSO WILL FOLLOW UP ON THE INCIDENTAL
RETROPERITONEAL MASS. MAY NEED A MRI OR CT IV CONTRASTED. SHE ALREADY IS GETTING
AN ABDOMINAL ULTRASOUND ORDERED BY DR. HAIDER.

(ECF No. 4-7, PageID.358.)

Dr. Slater examined Payment on March 17, 2016, and noted back pain at L4-5, chronic pain, and knee pain.  (*Id.*, PageID.398.)  Dr. Slater treated Payment with Hydromorphone (Dilaudid), Phentermine Hcl, Simvastatin, and Tizanidine Hydrochloride.  (*Id.*)

A March 30, 2016 CT scan of Payment's lumbar spine revealed mild lumbar spondylosis, multilevel central canal and neural foraminal stenosis, disk bulging/herniation (ECF No. 4-8, PageID.448-449):

Normal vertebral body height.  Slight retrolisthesis L2-3.  Mild disk
space narrowing L2-3.  Mild multilevel hypertrophic spurring.

L1-2, mild central canal stenosis secondary to facet and ligamentum
flavum hypertrophy.

L2-3, mild central canal stenosis secondary to facet and ligamentum
flavum hypertrophy.  Disk bulging with small broad-based left
paracentral/foraminal disk herniation mildly effacing left ventral
thecal sac and encroaching upon left exiting neural foramen.

L3-4, mild central canal stenosis secondary to facet and ligamentum
flavum hypertrophy with mild disk bulging.

L4-5, mild central canal stenosis secondary to facet and ligamentum
flavum hypertrophy with mild disk bulging.

L5-S1, small broad-based central disk herniation mildly effacing
ventral thecal sac.

Conus medullaris satisfactory.

(*Id.*, PageID.488.)

6

On May 17, 2016, Dr. Joseph Hance, M.D., performed a total right knee replacement. (*Id.*, PageID.517-519.)

A September 9, 2016 MRI of Payment's lumbar spine revealed mild spondylosis changes with degenerative disc disease at L2-L3 and L5-S1 with some mild facet degenerative changes. (*Id.*, PageID.509.)

### III.   RFC Questionnaire

Dr. Lawson completed an RFC questionnaire on January 8, 2018. (ECF No. 4-12, PageID.1037-1041.)  Dr. Lawson noted that Payment had lumbar foraminal stenosis, a right total knee replacement, and cervical disc surgery with a fair prognosis. (*Id.*, PageID.1038.)  Payment also had peripheral neuropathy, carpal tunnel syndrome, lumbar and cervical spondylosis, and fibromyalgia. (*Id.*)  Dr. Lawson wrote that Payment had right leg, lumbar, and neck pain, and experienced pain while walking, driving, and stooping. (*Id.*)  He noted that moderate drowsiness was the side effects of Payment's mediations. (*Id.*)

Dr. Lawson checked the box indicating that Payment would be off task 25 percent or more during a typical workday and is incapable of performing even low stress jobs. (*Id.*, PageID.1039.)  Dr. Lawson noted that Payment could sit for 30 minutes at a time for two hours and stand 20 minutes at a time for two hours. (*Id.*, PageID.1039-1040.)

Dr. Lawson noted that Payment needed a job that would allow her to change positions and take breaks. (*Id.*, PageID.1040.)  Dr. Payment concluded that Payment could occasionally lift 10 pounds and rarely lift 20 pounds. (*Id.*)  He further noted,

that Payment could occasionally look up and down, turn her head left or right and

hold it in a static position,  occasionally climb stairs, rarely twist, stoop, crouch/squat,

and never climb ladders.  (*Id.*, PageID.1041.)  He further indicated that Payment was

likely to have good days and bad days and miss work about four days per month.  (*Id.*)

### IV.    Hearing before ALJ

The ALJ conducted a hearing in Payment's case on May 31, 2018.  (ECF No. 4-

2, PageID.41.)  During the hearing, Payment was represented by Attorney Frank

Cusmano.  (*Id.*)

Payment testified that she lived on a "hobby farm" in Pickford, MI, where she

kept two horses.  (*Id.*, PageID.49.)  She said she could no longer engage in horseback

riding, yard work, fishing, camping, or visiting the casino.  (*Id.*, PageID.50.)  She

stated that she had not ridden horses for "a while."  (*Id.*)  Payment indicated that she

has difficulty concentrating due to pain.  (*Id.*, PageID.59-60.)  She said she put water

in the horses' bathtub.  She also said she was able to vacuum her house and drive.

(*Id.*, PageID.52.)  She also said she could take care of herself without assistance "most

of the time."  (*Id.*, PageID.54.)

During questioning by her attorney, Payment said that she had trouble

concentrating due to pain and that she can only sit for about 10 minutes before

standing due to pain.  (*Id.*, PageID.59.)  She said that, in 2015, she could only stand

for 10 or 15 minutes, that she could walk 200 or 300 feet, and that she could only lift

and carry about five pounds.  (*Id.*, PageID.61-62.)

Payment testified that, in 2015, she spent more than 50 percent of her day in a recliner with her legs elevated.  (*Id.*, PageID.65.)  In 2015, she had difficulty crouching, crawling, kneeling, and stooping, could not bend and touch the floor, and could only lift five pounds.  (*Id.*, PageID.62.)

Payment could not identify which specific pain killers she took in 2015, but stated that her medications "sort of make me groggy."  (*Id.* PageID.65.)

### V.    ALJ's Decision

ALJ Malloy's seven-page decision is the focus of this appeal.  In this decision, ALJ Malloy set forth the five-step sequential process used to determine whether an individual is disabled.  (ECF No. 4-2, PageID.29-30.)

Before stating his findings at each step, the ALJ found that Payment met the insured status requirements of the Social Security Act through December 31, 2015. (*Id.*, PageID.30.)

At step one, the ALJ found that Payment had not engaged in substantial gainful activity during the period from her alleged onset date of June 1, 2015, through the date last insured, December 31, 2015.  (*Id.*)

At step two, the ALJ found that Payment had the severe impairments of degenerative disc disease and degenerative joint disease.  (*Id.*)

At step three, the ALJ found that Payment did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, App'x 1.  (*Id.*)

Prior to step four, the ALJ found that Payment had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).[1] (*Id.*, PageID.30-33.)

In determining Payment's RFC, the ALJ considered Payment's description of her symptoms. The ALJ noted that he was utilizing a two-step process to evaluate these symptoms. First, he considered whether Payment's impairments could reasonably be expected to produce Payment's pain and other symptoms. And, second, he considered the intensity, persistence and limiting effects of these symptoms to

---

[1]    20 C.F.R. 404.1567(b) provides as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*SSR 83-10* provides as follows:

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

determine the extent to which they limit Payment's functional limitations. (*Id.*, PageID.31.)

The ALJ outlined Payment's statements from her function report and found that her medically determinable impairments could reasonably be expected to cause her alleged symptoms. But the ALJ found that Payment's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*) The ALJ based his conclusion that Payment's description of her symptoms was inconsistent with the record on specific parts of the record. The ALJ outlined parts of Payment's medical history that were important to his RFC analysis.

First, the ALJ noted that, in July of 2015, Payment underwent a right knee arthroscopy and partial medial meniscectomy. (*Id.*) She was subsequently treated for residual pain by a series of knee injections, prescribed medication, and a knee brace. (*Id.*)

Second, the ALJ noted that during a January 2016, examination, Payment reported that she no longer worked as a bus driver secondary to knee pain. (*Id.*, PageID.32.) Her physical examination was normal, with no evidence of cyanosis, clubbing, or edema. Payment had an unremarkable musculoskeletal examination, and a normal gait. (*Id.*) A December 2017, treatment note indicated that Payment underwent a total knee replacement in 2016. (*Id.*)

Third, the ALJ noted that an x-ray and MRI of her lumbar spine in September 2015 revealed mild multilevel hypertrophic spurring, facet arthropathy inferiorly,

and mild bilateral SI joint degenerative disease.  (*Id.*)  Payment participated in pain management and examination revealed positive findings of tenderness to palpation at L3L4, L4-5, L5-S1.  (*Id.*)  Testing revealed negative results for bilateral straight leg raises, bilateral Gaenslen's maneuver, Patrick's and Spurring.  (*Id.*)

The ALJ found that Payment's symptoms were not consistent with the record. The ALJ found that Payment's activities "suggest a greater level of functioning than alleged."  Payment reported in engaging in horseback riding, yard work, fishing, camping, and going to the casino in June of 2016.  (*Id.*)  The ALJ noted that Payment's March 2016 function report indicated that Payment fed, watered and took care of ducks, chickens, and horses on her hobby farm and cleaned out the barns.  (*Id.*)  The report also noted that Payment cooked, cleaned, did laundry, drove daily, and shopped in stores.  (*Id.*)  The ALJ noted that although she reported these activities after the date of last insured, it was reasonable to conclude that she was able to perform these activities during the relevant period.

In addition, the ALJ discussed Dr. Lawson's December 2017 opinion that Payment could no longer work as a bus driver due to knee pain but could perform only sedentary work after she recovered from L5-S1 decompression surgery that was pending.  The ALJ gave limited weight to Dr. Lawson's opinion.  The ALJ reasoned that the opinion was given outside the relevant period, and that the proposed restrictions were "speculative and premature" because they were not based upon an actual evaluation of Payment's functioning.  (*Id.*)

The ALJ also considered the opinion of treating physician Dr. Wroblewski, who performed a carpel tunnel release procedure in February of 2018 and had planned a second procedure for April of 2018.  (*Id*., PageID.33.)  Dr. Wroblewski noted that Payment would be off task 25 percent of the time due to attention and concentration deficits.  (*Id*.)  The ALJ assigned little weight to this opinion because the assessment and treatment occurred years after the date of last insured.  (*Id*.)

Furthermore, the ALJ assigned little weight to Ronnie Payment's third-party function report because it merely restated Payment's claims.  (*Id*.)  Ronnie Payment was identified as claimant's husband.

In summary, the ALJ found that his RFC assessment was supported by Payment's self-reported activities, her routine follow-up care during the relevant period, and the fact that no treating source opined that Payment was unable to sustain work activities on a regular and continuing basis.  (*Id*.)

At step four, the ALJ found that Payment could not perform past relevant work as a bus driver because that job required exertion at the medium level, which exceeded her RFC.  (*Id*.)

At step five, the ALJ concluded that there were jobs in significant numbers in the national economy that the claimant could perform.  (*Id*.)  The ALJ reached this conclusion by considering Payment's RFC, age, education and work experience[2] in conjunction with the Medical-Vocations Guidelines found in 20 C.F.R., Part 404,

---

[2]     Payment was 49 years old at the time of the 2018 hearing, had a high school education and graduated from two one-year college programs to become a health aid and a law clerk.  (ECF No. 4-2, PageID.47-48.)

Subpart P, Appendix 2.  (*Id.*, PageID.34.)  The ALJ found that Rule 202.21 from the Medical-Vocations Guidelines required a finding of "not disabled."  (*Id.*)

## VI.    Standard of Review

Review of an ALJ's decision is limited to two issues: (1) "whether the ALJ applied the correct legal standards," and (2) "whether the findings of the ALJ are supported by substantial evidence."  *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); 42 U.S.C. § 405(g).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. 42 U.S.C. § 405(g).

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole, and take into account whatever evidence in the record fairly detracts from its weight.  *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984) (citations omitted). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference.  *Mullen v. Bowen*, 800 F.2d

14

535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

## VII.   Analysis

Payment argues, first, that the ALJ erred in assessing her RFC by failing to consider adequately the side effects of her medications during the relevant period. Second, Payment says the ALJ erred in his disability analysis by failing to ask the vocational expert (VE) whether jobs Payment could perform jobs that existed in significant numbers in the national economy.

### A.   Five-Step Sequential Analysis

Generally, an ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At step one, the ALJ determines whether the claimant can still perform substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). Before proceeding to step four, the ALJ determines the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e). At step four, the ALJ determines whether

the claimant has the RFC to still perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  At step five, after considering the claimant's RFC, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines the claimant is not disabled under any step, the analysis ceases and the claimant is declared not disabled.  20 C.F.R § 404.1520(a)(4).  Here, the ALJ correctly stated this five-step sequential process and then based his decision on it.

### B.  The ALJ's Assessment of Payment's Subjective Symptoms

A claimant's RFC is the most, not the least, the claimant can do despite his impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 677 n.3 (6th Cir. 2013); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  RFC is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Deaton v. Comm'r of Soc. Sec.*, 315 F. App'x 595, 598 (6th Cir. 2009).  While the RFC determination is made by the ALJ, an ALJ's RFC determination must be supported by substantial evidence. *Torres v. Comm'r of Soc. Sec*, 490 F. App'x 748, 754 (6th Cir. 2012).  If the record contains "conflicting evidence that would suggest further limitations, under the substantial evidence standard, administrative findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Id.*

16

An ALJ's factual findings concerning a claimant's subjective symptoms are peculiarly within the province of the ALJ. *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); 20 C.F.R. § 404.1529; *SSR 16-3p*. The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed[.]" *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's findings are reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). Claimants challenging the ALJ's findings "face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). The Court must accord the ALJ's findings "great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

But the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007). The *Rogers* court observed that the ALJ must explain his evaluation of the claimants symptoms and that the explanation " 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.' " *Id.* (quoting a *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Assessing Disability Claims: Assessing the*

*Credibility of an Individual's Statements, SSR 96-7p, superseded by SSR 16-3p* (reprinted at 1996 WL 374186, at *4 (SSA July 2, 1996)).

Payment's overarching argument is that the ALJ failed to properly evaluate the consistency of her description of the intensity, persistence and limiting effects of her pain and other symptoms, which led the ALJ to make an incorrect RFC assessment.  Specifically, Payment points to the type, dosage, effectiveness, and side effects of her medications:  Percocet, Oxycodone, Simvastatin, and Vitamin D.  This appears to be Payment's only criticism of the ALJ's RFC assessment.  Payment also argues that the ALJ failed to account for these side effects in his hypothetical question to the VE.

Payment correctly notes that *SSR 16-3p* and 20 C.F.R. § 404.1529 require the ALJ to evaluate seven factors when assessing the claimant's subjective symptoms. One of the factors is the effects of the medications the claimant was taking.  The factors are:

1.  Daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment or medication an individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and

> 7.  Any other facts concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*SSR 16-3p(d)*.    The ALJ need not address each factor but will discuss the factors that are "pertinent to the evidence in the record."  *Id*.

An ALJ must consider the negative side effects of pain medications when considering whether the claimant is employable in the national economy – especially potent medications which have known side effects such as drowsiness, fatigue, light-headedness, and weakness.  *White v. Commissioner*, 312 F. App'x 779, 789-90 (6th Cir. 2009) (ALJ erred by failing to account for known side effects of Valium, Vicodin, and a Duragesic patch in his hypothetical question to the VE).  However, an ALJ is not required to incorporate unsubstantiated complaints and restrictions into the hypothetical question.  *Keeton v. Commissioner*, 583 F. App'x 515, 533 (6th Cir. 2014). The ALJ need not consider allegations of the side effects of medication that are not documented in the record.  *Essary v. Commissioner*, 114 Fed. Appx. 662, 665 (6th Cir. 2004) (ALJ did not err by failing to credit alleged side effects of medication where the claimant had failed to report alleged drowsiness from the medication Oxycodone and other claimed side effects due to her medications to her physicians).

Payment could not remember which medications she was taking in 2015, but stated that these medications "sort of make me groggy."   (ECF No. 4-2, PageID.65.) Payment, who was represented by counsel at the hearing, never gave any further explanation as to how she was affected in her activities when she was "groggy." Payment does not identify medical records that support a claim that Payment could

not perform work or daily activities due to the side effects of any of the medications she was taking in 2015. Payment's argument simply does not give the Court cause to reverse the ALJ's decision. She said she was "sort of" groggy due to the effects of an unspecified medication. (ECF No. 4-2, PageID.65.) It is difficult to see why the ALJ would delve more deeply into Payment's medication-induced symptoms given Payment's ambiguous response to her own attorney's questions.

The ALJ was clear as to the basis for his RFC assessment and his evaluation of the consistency of Payment's self-described symptoms. The ALJ found that Payment's self-reported symptoms were inconsistent with the record due to (1) her daily activities, (2) the routine nature of the follow-up care she received during the relevant period, and (3) the absence of an opinion from a treating source that Payment could not work on a regular and continuous basis. (ECF No. 4-2, PageID.33.) Payment does not challenge any of these reasons. She simply asserts that the ALJ failed to account for the side effects of her medications. Given the limited scope of Payment's challenge to the ALJ's decision, the undersigned declines to formulate arguments on Payment's behalf, or to undertake an open-ended review of the entirety of the administrative record to determine whether it is inconsistent with the ALJ's decision. *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

It should also be noted that the medical records do not support the conclusion that Payment was seriously and adversely affected by the medications she was taking. Dr. Lawson noted in his January 8, 2018, RFC questionnaire that moderate

drowsiness was a side effect of Payment's medications.  (ECF No. 4-12, PageID.1038.) However, the medical records do not discuss the effects of Payment's medications on her ability to engage in work or non-work related activities during the relevant period between June 1, 2015 through December 31, 2015.

### C. ALJ's Reliance on "The Grids" at Step Five

As noted above, before moving to step four, the ALJ concluded that Payment's RFC allowed her to perform the full range of light work.  (ECF No. 4-2, PageID.30-33.)  The ALJ then found that Payment could not perform her past relevant work as a bus driver because this job required medium exertion, which exceeded her RFC.  (*Id.*, PageID.33.)  The ALJ then used the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, to determine whether Payment was disabled.

The procedure employed by the ALJ was correct.  "[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  This burden can, on occasion, be satisfied by relying on the Medical-Vocational Guidelines. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).  "The grids are a shortcut that eliminate the need for calling in vocational experts." *Cotton v. Comm'r of Soc. Sec.*, No. 1:14-CV-900, 2016 WL 80667, at *5 (W.D. Mich. Jan. 7, 2016).  "The Secretary employs the Medical–Vocational Guidelines . . . after it has been determined that the claimant has not met the requirements of a listed impairment but is nevertheless incapable of performing past relevant work." *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).  "The grid aids the Secretary in determining disability claims by

allowing 'administrative notice' to be taken of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of performing." *Id.*

The ALJ's step five analysis is shown below.

If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Based on a residual functional capacity for the full range of light work, the undersigned concludes that, through the date last insured, considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.21.

**11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2015, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(g)).**

(ECF No. 4-2, PageID.34.)

Medical-Vocational Rule 202.21 in Table 2 provides that a younger individual, with a least a high school education and past work experience as skilled or semi-skilled is not disabled if that individual can perform light work.  20 CFR Part 404, Subpart P, Appendix 2, table 2, § 202.21.[3]  The ALJ was not required to consult an expert to identify jobs that can accommodate a claimant's RFC where a claimant is relying on non-exertional impairments.  *Dyson v. Commissioner*, 786 F. App'x 586,

---

[3]    The same finding is directed for a similar individual who can perform only sedentary work.  20 CFR Part 404, Subpart P, Appendix 2, table 1, § 202.21.

590 (6th Cir. 2019). Under these circumstances, the ALJ does not err by relying on the Medical-Vocational Guidelines rather than posing hypothetical questions to the VE.

## VI. Recommendation

For these reasons, it is respectfully recommended that the Court affirm the ALJ's decision.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ *Maarten Vermaat*

Maarten Vermaat
U. S. MAGISTRATE JUDGE

Dated: August 12, 2020